UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

MELLISSA RINEHOLT,                )
                                  )
        *Plaintiff,*              )
                                  )
v.                                )          No. 1:08-cv-5
                                  )          *Edgar / Carter*
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
        *Defendant.*             )

## MEMORANDUM

Plaintiff Mellissa Rineholt brought this action seeking judicial review of the final

decision of the Defendant Commissioner of Social Security ("Commissioner") pursuant to

Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g).  On July 21, 2006 an

administrative law judge ("ALJ") denied Plaintiff a period of disability and disability insurance

benefits ("DIB") pursuant to the Act, 42 U.S.C. §§ 416(I), 423, and 1382.  [Court Doc. No. 8,

Administrative Record ("AR"), pp. 13-23].  Plaintiff appealed the ALJ's decision to the Social

Security Administration's ("SSA") Appeals Council.  On December 20, 2005 the Appeals

Council denied Plaintiff's request for review.  AR, p. 5.  The ALJ's decision became the final

decision of the Commissioner.  *Id.* Plaintiff seeks judicial review of the ALJ's decision.

In her decision the ALJ made a number of findings.  The ALJ determined that Plaintiff

met the Act's disability insured status eligibility requirements.  She also found that Plaintiff had

not engaged in "substantial gainful activity" since January 8, 2002.  She found that Plaintiff had

"severe" impairments, but that her combination of impairments were not medically equal to an

impairment listed in 20 C.F.R. Part 404, Appendix 1, Subpart P.  The ALJ concluded that

Plaintiff's testimony at her hearing was not fully credible and that she had the residual functional

capacity "to perform unskilled and lower-level semiskilled work activity at any exertional level, which avoids workplace hazards and work with the general public." AR, p. 18. The ALJ determined that Plaintiff's current impairments did not prevent her from performing "past relevant work" and that she did not meet the Act's definition of disabled at any time. *Id.*

Following the filing of her appeal in this Court, Plaintiff moved for summary judgment. [Court Doc. No. 9]. The Commissioner cross-moved for summary judgment. [Court Doc. No. 13]. This Court referred the matter to Magistrate Judge William Carter pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). The Magistrate Judge issued a report and recommendation on February 13, 2009 recommending that this court uphold the decision of the ALJ to deny social security benefits. [Court Doc. No. 16].

The Plaintiff timely objected to the Magistrate's report and recommendation. [Court Doc. No. 17]. The Commissioner failed to respond to the objections of the Plaintiff. This Court must conduct a *de novo* review of the portions of the report and recommendation to which objection is made. 28 U.S.C. § 636(b)(1)(c). This Court may then either accept, reject or modify the magistrate's report and recommendation either in whole or in part. *Id.*

For the reasons expressed herein, the Court will **REJECT** the magistrate's determination to uphold the ALJ's decision. The Court will therefore **GRANT** Plaintiff's motion for summary judgment and will **DENY** the Commissioner's motion for summary judgment. The court will **REMAND** this action to the Commissioner for further proceedings.

## I. Background

The issue presented for judicial review is whether the ALJ's determination that Plaintiff is not disabled and therefore not eligible for disability insurance or supplemental security income

is supported by substantial evidence. The record indicates that at the time of the administrative hearing in June 2006, Plaintiff was a thirty-two year old woman with a history of seizures, depression, panic attacks, anxiety, obesity, and agoraphobia who also exhibited evidence of mental impairment.

On July 21, 2006 The SSA, through a United States Administrative Law Judge ("ALJ") issued an unfavorable decision to Plaintiff denying her request for social security disability benefits. AR, pp. 13-14. In her opinion the ALJ made several findings of fact, including that the Plaintiff had not engaged in any "substantial gainful activity" since January 8, 2002. AR, p. 17. The ALJ also determined that the evidence demonstrated that the Plaintiff suffered from the severe impairments of a "seizure disorder, borderline intellectual functioning with a history of a learning disorder, obesity, asthma, depression, and anxiety with panic attacks and symptoms of agoraphobia." *Id.* The ALJ noted that the Plaintiff had participated in special education since her kindergarten year. *Id.* at 17-18. With respect to the claim that Plaintiff demonstrated evidence of mental retardation, the ALJ noted:

> Counsel argues the claimant's impairments meet/equal Listing 12.05c, which is satisfied by evidence of mental retardation, manifested during the developmental period, with an intelligence quotient between 60 and 70, and the presence of an additional impairment, physical or mental, which imposes an additional and significant work-related limitation. I find, however, the claimant's adaptive functioning, with a history of semi-skilled work activity and significant independent living, belie her IQ scores in the 60-70 range.

AR, p. 18. In her opinion the ALJ described the comprehensive psychological evaluations the Plaintiff received:

> The Social Security Administration referred the claimant for consultative psychological evaluations, which were overseen by Vijai P. Sharma, Ph.D., in October 2001, March 2004, and December 2004. Mental status findings included the claimant's understanding of the purpose of the evaluations, a dysphoric mood,

-3-

and coherent and complete thought processing, albeit with a limited fund of information, social comprehension, and ability for abstract reasoning. The claimant related a history of seizures and headaches since the age of 12, following a head injury in 1984. She cited a relative seizure hiatus for many years, with resumption of seizure activity after a 1997 head injury. The claimant also related a history of breathing problems. Evaluation notes, however, included that the claimant's physical and seizure problems have diminished over time. Psychometric testing, on the Wechsler Adult Intelligence Scale – Third Edition (WAIS -III) revealed a full-scale IQ score of 67 in 2001, and diagnoses were mild mental retardation, a major depressive disorder, a panic disorder with agoraphobia, and a seizure disorder, and the evaluator assigned a global assessment of functioning (GAF) of 31 to 48, which is consistent with major impairment. . . WAIS-III testing, in 2004, yielded a full-scale IQ score of 72, and additional testing showed the claimant to have a seventh grade reading level and an eighth grade arithmetic level. The evaluator, in 2004, diagnosed borderline intellectual functioning, a mood disorder, and an anxiety disorder. The claimant underwent a third psychological evaluation under Dr. Sharma's signature, and at the request of counsel, in December 2004. Dr. Sharma noted the claimant's social functioning appeared somewhat heightened in that she reported a regular boyfriend, and the claimant reported daily activities to include cleaning and cooking, grocery shopping with her mother, regular church attendance, and daily reading. Dr. Sharma diagnosed a mood disorder, a cognitive disorder, a pain disorder, and borderline intellectual functioning.

AR, p. 20. The ALJ questioned the Plaintiff's credibility regarding her symptoms, noting "the claimant's statements concerning the intensity, persistence and limited effects of these symptoms are not entirely credible." *Id.* The ALJ determined that the record demonstrated that Plaintiff could engage in significant independent living: "the claimant lives on her own in an apartment, prepares some of her own meals, goes to the community center to play games and eats lunch with other residents of her apartment complex, and returns home to watch television or movies, nap, eat dinner, and again watch television or listen to the radio until bedtime." AR, p. 21. The ALJ decided to afford Dr. Sharma's evaluations "limited weight" and found "no objective evidence to support his findings." AR, p. 22. In addition to determining that Plaintiff did not meet the definition of mentally retarded outlined in the regulations, the ALJ further determined

-4-

that "[t]he claimant is capable of performing past relevant lower-level semiskilled work as a photo laboratory spotter." AR, p. 23. The ALJ finally concluded that the Plaintiff was not disabled and was not entitled to DIB or to supplemental security income. AR, p. 23.

The record demonstrates that the Plaintiff's yearly earnings from 1990 to 2006 ranged from a low of $0 in the year 2000 and the years 2003 through 2006 to a high of $8,650.19 in the year 1997. AR, p. 69. The record indicates that as of June 3, 2006, Plaintiff was taking two kinds of seizure medication prescribed by her treating physicians. AR, p. 85. Although Plaintiff's work history report lists several different types of jobs that Plaintiff held, it is unclear how long Plaintiff worked at each job. *See*, AR, p. 91. The ALJ made no findings of fact regarding the length of time that Plaintiff spent at any of the various jobs she listed on her work history report. Plaintiff's various positions include stints of indeterminable length as a cashier, a machine operator, a nursery worker, a cook, a line server, a sock presser, and a photography laboratory spotter. *Id.* For at least four of the positions listed in the record, it appears that Plaintiff only worked about six weeks at each one. *See* AR, pp. 108-09, 115.

The record clearly demonstrates, and the parties do not appear to dispute that Plaintiff received special education services while in elementary and secondary school beginning in 1984. *See e.g.,* AR, pp. 143-152. Although the record does not contain any IQ scores for Plaintiff before age twenty-two, her 1994-95 Individualized Educational Plan indicates that she was classified as "Mentally Retarded" and further states that "[s]he has been identified as mentally retarded." AR, pp. 143-44. A "psychoeducational evaluation" from 1991 when Plaintiff was age 17 revealed that Plaintiff's reading level was a grade level of 4.4 and her math skills were a grade level of 2.4. AR, p. 153. Both skills were in the less than one percentile rank. *Id.* The

school psychologist noted that "[b]ased on the current information as well as previous information contained in the file, I would recommend to the Committee on Special Education that Mellissa be classified as mentally deficient and receive services through an Option I classroom at the Thousand Islands Central High School Building." AR, p. 154. The record reveals that the Plaintiff graduated from high school with a special education diploma in June of 1994. AR, p. 158.

Although the ALJ found that Plaintiff demonstrates significant independent living skills, the record appears more nuanced than the ALJ's decision suggests. For example, on a questionnaire entitled "Activities of Daily Living Questionnaire" the Plaintiff responded in September of 2004 that she left her home "once a day to check my mail." AR, p. 174. She further indicated that she did not "do any activities outside my home. I mainly stay inside my home." *Id.* She stated that she needed assistance both in going to the grocery store and in picking up medicines from the pharmacy. *Id.* Although she indicated that she prepared her own meals, the questionnaire indicated that she could microwave food, oatmeal, and soup and that she did not cook very often. *Id.* She stated that when she had "something baking in the oven" she had to have her mother remove it for her so that she would not injure herself. AR, p. 175. She asserted that she needed help doing her wash and dusting. *Id.* She further indicated that she shopped once a month for groceries with the help of her mother. *Id.* Her other activities included listening to music and watching movies, along with occasional reading. Plaintiff listed the following typical daily activities: "8:00 AM – I take my medicine; I eat breakfast; I pray; I make my bed; I get dressed. 12:00 PM– I take my medicine; I eat lunch; I read a book; I sleep (nap); 5:00 PM– I eat supper; I take a bath; I pray; I read my Bible; I sleep (nap); 8:00 PM – I eat

-6-

a snack; I pray; I read my Bible; I go to bed." AR, p. 178. *See also*, AR, pp. 199-204. On

another questionnaire, Plaintiff asserted that she went outside about four times per week to go to

church, check the mailbox and throw out the garbage. AR, p. 254.

In 2001 Dr. Sharma's office evaluated Plaintiff to determine the extent of her disabilities.

AR, p. 274-281. Dr. Sharma is a clinical psychologist. The report from his office indicated that

"[t]he client was identified with mental retardation or developmental issues early on in schooling

and was placed in developmental track throughout her schooling." AR, p. 275. The report

further noted:

> The client indicates that daily activities are limited and she indicates that she
> generally stays home during the day. She is involved in rather little activity. Her
> days usually begin around 9 or 9:30 and she usually retires at 9 or 9:30 in the
> evening. . . . The client indicates that performance of household tasks is limited.
> She indicates that meal preparation is as simple as possible. The client does some
> cleaning but cleaning is limited. The client is not a thorough cleaner. The
> client's mother confirms this information. The client will go to the grocery store
> with her mother. . . . The trips out in public for shopping are limited because of
> the client's frequent experiencing panic attacks.

AR, p. 276. The 2001 report indicates the following IQ scores:

> Verbal IQ is equal to 68 (65 to 73, 90 percentile interval); second percentile rank.
> Performance IQ was equal to 72 (68 to 76); third percentile rank. Full scale IQ
> equal to 67 (64 to 71); first percentile rank.

> Performance on the WAIS-III, the client obtained a verbal IQ of 68 lying within
> the mildly mentally retarded range of intellectual functioning, performance IQ of
> 72 lying within the borderline range of intellectual ability, and a full scale IQ of
> 67 lying within the mild mentally retarded range of intellectual functioning.
> Current assessment results appear to be consistent with the client's history of
> intellectual functioning which probably has been at or near the cusp of the mild
> mentally retarded and borderline ranges of intellectual ability.

AR, p. 279. The report lists a diagnosis of "mild mental retardation." AR, p. 280.

In 2004, Dr. Sharma's office conducted another examination of Plaintiff. *See* AR, pp.

317-325. Again, the report describes Plaintiff's daily activities as "relatively limited." AR, p.

319. At that time "on the WAIS-III, the claimant obtained a Verbal IQ of 66, laying [sic] within

the mildly mentally retarded range of intellectual functioning, a Performance IQ of 83, laying

[sic] within the low-average range of intellectual functioning, and a Full-Scale IQ of 72, laying

[sic] within the borderline range of intellectual ability." AR, p. 323. At this time, the Plaintiff's

diagnosis was "Borderline intellectual functioning." AR, p. 324.

Dr. Sharma's office again evaluated Plaintiff in December of 2004. *See* AR, pp. 405-

413. The report explains Plaintiff's history in part:

> She obtained a special high school diploma with special education placement
> throughout her schooling. The client indicates a history of fairly independent
> living, although she lives in subsidized housing, and is in a small apartment,
> which she maintains. . . . The client indicates that she has a boyfriend, who comes
> over and helps cook for her, and performs tasks for her. . . .
> The client describes daily activities as relatively limited, although she is able to
> clean her small apartment. She is able to make simple meals for herself. She is
> able to microwave or warm up food. She also eats a lot of snacks or junk foods.
> She indicates the family helps with shopping. She indicates that she has difficulty
> with money management, and although she will pick out items with her mother,
> her mother has to figure out the prices, and whether she has enough money to buy
> the [unreadable]. The client's finances are limited, and apparently she is fairly
> dependent upon family members for financial assistance, although she has
> received subsidized housing, and has had food stamps at times. She apparently
> would have difficulty managing finances on her own, because of significant
> learning issues.

AR, pp. 406-08. Although this evaluation does not provide new IQ scores, the diagnosis portion

of the report indicates "Borderline intellectual functioning." AR, p. 412.

On October 18, 2004, Plaintiff's treating neurologist, Dr. Frank Calhoun, issued a report

relating to Plaintiff's neurological functioning. AR, p. 433. The report indicates that the

Plaintiff continued to have "petit mal seizures," one occurring about a month prior to the report

date with one or two per month. *Id.* At that time an MRI of the Plaintiff's brain was normal, but

-8-

an EEG test was abnormal for "generalized seizure disorder." *Id.* On December 14, 2004,

another treating neurologist, Dr. Charles Han, recommended that Plaintiff could return to work

for "light duty" based on the absence of seizures for more than three months. AR, p. 435. The

record indicates that by July 7, 2005, Plaintiff had been "seizure-free" for more than six months.

AR, p. 437.

A June 2006 diagnostic evaluation report issued by Dr. Sharma indicates that Plaintiff

was experiencing severe anxiety, as well as severe depression. AR, p. 535. His summary of

findings and observations indicated the following:

> 1. Impulse control disorder was present in school years and has continued ever since.
> 2. Seizure disorder manifested in teen years as per patient reports, which triggers angry outbursts and impulsive behaviors.
> 3. Anxiety disorder and depressive disorder appeared to have begun during school years associated with mental limitations and major medical condition (i.e. epileptic seizures).
> 4. Head trauma in recent years from accident might have occurred on top of the epileptic disorder in a person who already had an impulse control disorder as evident in teen years.
> 5. Her volatile temper and continued feeling that she is at the verge of violent outburst may be a combination of impulse disorder, untreated seizures (due to Tenn Care termination she is not on seizure medication) and depression and anxiety disorder.
> 6. Depression and anxiety disorders have continued throughout her adult life.
> 7. Her intellectual functioning may be impaired by a combination of underlying mental impairment, head trauma and seizures.

AR, p. 536.

The parties attended an administrative hearing on June 14, 2006. *See* AR, pp. 556-592.

At the hearing the Plaintiff testified that the longest she had ever worked at a particular job was

six months. AR, p. 567. The Plaintiff also testified regarding her migraine headaches, as well as

her panic attacks. AR, pp. 576-77. She further testified that she wakes around 9:00 or 10:00 in

-9-

the morning, goes to the bathroom, makes something to eat, and walks to the community center in the low income housing complex where she lives for lunch. AR, p. 578. She testified that:

> I go over there and they have an activity center where you can eat dinner or seniors [sic] and people that live around where I live in my community. I go over there and play games with my other neighbors. It's walking distance. It's not very far from me. And then from there I go back home and go in and watch TV for a while or watch a movie and then I take a nap. And then I get up and eat again and get my bath for the evening or the night, and then I read or watch TV some more and then I go to bed.

AR, p. 578.

Initially, the vocational expert ("VE") who testified at the administrative hearing indicated that Plaintiff could only continue her past work as a photo spotter, based on her current limitations. AR, p. 581. However, when the ALJ included Plaintiff's migraine headaches, as well as seizures into the hypothetical calculus of her limitations, the VE testified that Plaintiff could not perform any of her past work. The exchange during the hearing was as follows:

> Q: Dr. Caldwell, the individual suffers from seizures, that they are experiencing them two times a month. It takes them one hour to recover from the seizure. They also suffer from migraine headache and as a result of these migraine headaches they're finding that they need to lay down for an hour to an hour and 45 minutes and they are having those, experiencing those one time a week and also suffers from depression and as a result would not leave the house perhaps one time a week. They would have panic attacks if they are in a tight, close space surrounded by a lot of people. Would a person with those with those restrictions be able to perform the claimant's past work?
> A: No.
> Q: Would there be other work available?
> A: No, there would not be.
> Q: And what would preclude all work?
> A: She indicates she has seizures two times a month, which may take 60 minutes to recover, so maybe even one of those happened at work. They might all happen at work, but even if just one of them happened at work. I think she has headaches where she needs to lie down for an hour, an hour and 45 minutes. That happens once a week. She may not leave the house one time a week. That would mean that she would have four absences a month in general, and that the panic attacks in a small space with lots of people, that's really not a significant factor.

-10-

But with those other things, those other limitations as described, there just really wouldn't be any work that could be done on a sustained basis.

Q:     And that's because she would be absent more than four times a month?

A:     Yes.

Q:     Dr. Caldwell, the testimony that you provided with regard to claimant's ability to perform work in the national economy, competitive employment, and inability to perform work as you just indicated, is that testimony consistent with the <u>Dictionary of Occupational Titles</u>?

A:     Yes, it is.

AR, pp. 583-85.  Following the administrative hearing, the ALJ issued her opinion on July 21, 2006 denying Plaintiff's request for benefits.  AR, pp. 15-23.

## II.     Standard of Review

42 U.S.C. § 405(g) states in relevant part:

[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, . . . .

42 U.S.C. § 405(g).

The Sixth Circuit has outlined the parameters for reviewing the Commissioner's determination regarding eligibility for DIB in accordance with 42 U.S.C. § 405(g).  In *Warner v. Commissioner of Social Security* the Sixth Circuit stated:

'[t]his Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. . . . Substantial evidence exists when a 'reasonable mind might accept' the relevant evidence 'as adequate to support a conclusion.' . . . As long as substantial evidence supports the Commissioner's decision, we must defer to it, " 'even if there is substantial evidence in the record that would have supported an opposite conclusion. . . .'

375 F.3d 387, 390 (6th Cir. 2004) (quotations omitted); *see also*, 42 U.S.C. § 405(g); *Smith v. Comm'r of Soc. Sec.*, __ F.3d __, 2007 WL 1040037 *3 (6th Cir. 2007).  Whether the substantial

-11-

evidence supports the ALJ's conclusion must be determined by a review of the record as a whole. *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984). The Sixth Circuit has cautioned courts not to "'focus and base [their] decision on a single piece of evidence, and disregard other pertinent evidence.'" *Id.* (quoting *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978)).

The Commissioner's task is to "resolve conflicts in the evidence and to decide questions of credibility." *Felisky v. Bowan*, 35 F.3d 1027, 1035 (6th Cir. 1994). Further, "[t]he substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm." *Id.* (citations and quotation omitted); *see also, Smith v. Chater*, 99 F.3d 780, 781-82 (6th Cir. 1996). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hale v. Secretary of Health and Human Serv.*, 816 F.2d 1078, 1082 (6th Cir. 1987) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)). In addition, ALJ determinations regarding a claimant's credibility "are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

The Sixth Circuit has outlined four legal propositions relating to Social Security Disability cases to consider when making disability determinations:

> 1. The burden of proof in a claim for Social Security benefits is upon the claimant to show disability which prevents her from performing any substantial gainful employment for the statutory period. Once, however, a prima facie case that claimant cannot perform her usual work is made, the burden shifts to the Secretary to show that there is work in the national economy which she can perform.
> 2. Convincing proof, consisting of lay testimony supported by clinical studies and medical evidence, that pain occasions a claimant's inability to perform his or

-12-

her usual work is sufficient to make a prima facie case.
3. In determining the question of substantiality of evidence, the reports of physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim.
4. Substantiality of the evidence must be based upon the record taken as a whole.

*Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (citations omitted).

Further,

[u]pon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying. Therefore, we are limited to evaluating whether or not the ALJ's explanations for partially discrediting [the claimant] are reasonable and supported by substantial evidence in the record.

*Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citation omitted).

### III. Analysis

Plaintiff bears the ultimate burden of establishing an entitlement to disability benefits by demonstrating the presence of a disability as defined by the Act. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition,

[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

The Social Security regulations promulgated pursuant to the Act describe a five step

-13-

"sequential evaluation process" for determining whether a claimant is disabled under the Act.

*See* 20 C.F.R. § 404.1520(a)(4). The Sixth Circuit has recently summarized these five steps

outlined in the Social Security regulations:

> In step one, the SSA identifies claimants who 'are doing substantial gainful activity' and concludes that these claimants are not disabled. If claimants get past this step, the SSA at step two considers the 'medical severity' of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. Claimants with impairments of insufficient duration are not disabled. Those with impairments that have lasted or will last at least twelve months proceed to step three.

> At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. . . . A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

> In the fourth step, the SSA evaluates claimants' 'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.' Claimants whose residual functional capacity permits them to perform their 'past relevant work' are not disabled. 'Past relevant work' is defined as work claimants have done within the past fifteen years that is 'substantial gainful activity' and that lasted long enough for the claimant to learn to do it. Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform 'substantial gainful activity' other than their past relevant work. Claimants who can perform such work are not disabled. The SSA bears the burden of proof at step five.

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006) (citations and quotations

omitted) (relying on 20 C.F.R. § 404.1520(a)(4)).

The regulations provide that in order to demonstrate a disability of mental retardation, a

claimant must satisfy one of four tests. The Plaintiff claims that she satisfies the test outlined in

-14-

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C:

> Mental retardation refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested during the
> developmental period: *i.e.*, the evidence demonstrates or supports onset of the
> impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied. . . .
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
> or other mental impairment imposing an additional and significant work-related
> limitation of function; . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C.  To demonstrate the initial showing of the

onset of impairment before the age of 22, "a claimant is by no means *required* to produce an IQ

score obtained prior to age 22."  *West v. Commissioner of Social Security Admin.*, 2007 WL

1991059, 240 F. App'x 692, 698 (6th Cir. July 5, 2007).  It is true that an ALJ "'is not required to

accept a claimant's IQ scores . . . and may reject scores that are inconsistent with the record.'  In

fact, IQ scores 'should be examined to assure consistency with daily activities and behavior.'"

*Hines v. Astrue*, 2009 WL 764152 *3 (8th Cir. Mar. 25, 2009) (quoting *Miles v. Barnhart*, 374

F.3d 694, 699 (8th Cir. 2004)); *see also, Baker v. Commissioner of Social Sec.*, 21 F. App'x 313,

315 (6th Cir. 2001)(citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)).  In addition, as the

Sixth Circuit has noted, "it is not enough for a claimant to point to one IQ score below 71; the

claimant must also satisfy the 'diagnostic description' of mental retardation in Listing 12.05."

*Cooper v. Commissioner of Social Security*, 217 F. App'x. 450, 452 (6th Cir. 2007).

However, when other portions of the record support the finding of mental retardation, an

ALJ may be in error to reject IQ scores that support such a finding.  *See e.g. Bailey v. Apfel*, 230

F.3d 1063, 1065-66 (8th Cir. 2000).  For example, in *Brown v. Secretary of Health and Human*

*Serv.*, the Sixth Circuit concluded that the Secretary had not demonstrated substantial evidence

in the record to support his rejection of a claimant's IQ score of 68. 948 F.2d 268, 270 (6th Cir. 1991). The Sixth Circuit emphasized that "Section 12.00 D of the Appendix provides that 'where more than one IQ is customarily derived from the test administered . . . *the lowest of these is used in conjunction with listing 12.05*." *Id.* at 269 (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00D(6)(c)). In *Brown*, the Sixth Circuit described the claimant's participation in the following activities:

> [claimant] use[s] public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed the sixth grade; he has a limited level of reading comprehension . . . ; and as a truck driver, [the claimant] recorded mileage, the hours he worked, and the places he drove.

948 F.2d at 270. However, the Sixth Circuit did not "deem these facts to be inconsistent with a valid test I.Q. of 68 . . ." and determined that the claimant's full scale IQ score of 68 was valid. *Id.* at 270-71; *see also Cossin v. Apfel*, No. 2:99:CV-592, 2000 WL 1458813 (S.D. Ohio Sept. 22, 2000) (reversing Commissioner's decision to deny benefits and remanding for further review of claimant's intellectual functioning).

Further, an ALJ is required to discuss the evidence in the record and explain her reasons for not finding a disability. *See Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). As the Tenth Circuit explained in *Clifton*:

> In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at that conclusion. The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

-16-

*Clifton*, 79 F.3d at 1009-1010.

In this case the parties appear to agree that the onset of Plaintiff's mental impairments appeared before the age of 22. The record demonstrates that Plaintiff was in special education during both elementary and secondary school and that she graduated with a special education diploma. Her school records indicate a designation of "mildly mentally retarded," as well as low standardized test scores within the first percentile or lower. *See* AR, pp. 143-152. Therefore, the record demonstrates, and the parties do not appear to disagree, that Plaintiff meets the first requirement of the Section 12.05C criteria, that the onset of the mental impairment be prior to the age of 22.

With respect to the requirements of Section 12.05C, the record reveals six different IQ scores, based on WISC-III tests, which are specifically endorsed by the regulations. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00D(6)(c). In 2001, Plaintiff's IQ scores were: verbal, 68; performance, 72; and full scale 67. AR, p. 279. In 2004, the Plaintiff's IQ scores were: verbal, 66; performance 83; and full scale 72. AR, p. 323. There is nothing in the record that suggests that these IQ scores were not valid. The ALJ acknowledged in her opinion that some of Plaintiff's scores were in the 60-70 range identified in Section 12.05C; however, she dismissed these scores by stating that "the claimant's adaptive functioning, with a history of semi-skilled work activity and significant independent living, belie her IQ scores in the 60-70 range." AR, p. 18. However, the ALJ's opinion does not cite to *Brown* and does not explain why she rejects three scores out of six that are between 60 and 70. 948 F.2d 268. The regulations specifically indicate that the lowest IQ score should be used in examining IQ scores under Section 12.05. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00D(6)(c). Plaintiff's

-17-

history of semi-skilled work activity is far from clear in the record. For example, the forms the Plaintiff completed do not accurately indicate start dates and end dates for each position. Nor are the circumstances regarding the terminations of the positions explained. Further, many of the positions appear to have been only a few weeks in duration. Plaintiff testified at the hearing that she believed her longest job was six months. Thus, it is unclear from the record what the scope of Plaintiff's history of "semi-skilled work" is.

Further, the record belies the ALJ's finding that plaintiff has "significant independent living." The record reveals that Plaintiff lives by herself in subsidized housing. However, although the ALJ finds that Plaintiff cooks, plays games, and eats lunch with neighbors, the record reveals that Plaintiff's activities are highly limited. The questionnaires completed by Plaintiff, as well as her testimony at the administrative hearing disclose that Plaintiff does very little; she can microwave food and make a sandwich. She can walk out of her house to eat lunch at a community center and play games. She naps a lot, goes to bed early, arises late. She watches TV and listens to music. She attends church and goes shopping at the grocery store once a month with the assistance of her mother. She does not drive; her employment stints have been short-lived without sizeable income. She can do light housecleaning, but has problems handling all of her chores. Some days it appears that Plaintiff may go out of her home only to check the mail. The record reveals a more subtle picture of the "significant independent living" described by the ALJ that is not inconsistent with the range of daily activities found by the Sixth Circuit in *Brown* to not be inconsistent with an IQ of 68. *See* 948 F.2d at 270.

Finally, Plaintiff appears to meet the requirement of Section 12.05C that, in addition to a valid IQ score of between 60 and 70, she have a "physical or other mental impairment imposing

an additional and significant work-related limitation of function."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C.  The record clearly shows that Plaintiff has several other impairments, including a history of seizures, migraines, depression, anxiety, panic attacks, agoraphobia, and obesity.

The court concludes that it is not clear that Plaintiff's history of short jobs and limited daily activities belie her IQ scores in the 60-70 range.  Therefore, the court will **REMAND** this action to the Commissioner to review the record and expand on the current record with further details regarding Plaintiff's level of cognitive functioning and any other information deemed necessary, including further IQ testing.  If the ALJ again rejects half of Plaintiff's qualifying IQ scores under Section 12.05C, she should explain the reasons for such rejection in greater detail.

The Sixth Circuit has explained that at step four of the disability determination, "[c]laimants whose residual functional capacity permits them to perform their 'past relevant work' are not disabled.  'Past relevant work' is defined as work claimants have done within the past fifteen years that is 'substantial gainful activity' and that lasted long enough for the claimant to learn to do it.  Claimants who can still do their past relevant work are not disabled."  *Combs*, 459 F.3d at 642-43.   The regulations define "past relevant work" as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 404.1560(b).  They further define the term "substantial gainful activity":

> Substantial gainful activity is work activity that is both substantial and gainful:
> (a) *Substantial work activity*.  Substantial work activity is work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
> (b) *Gainful work activity*.  Gainful work activity is work activity that you do for

pay or profit.  Work activity is gainful if it is the kind of work usually done for
pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572(a)-(b).  Further, the regulations provide that "[w]e consider that your work

experience applies when it was done within the last 15 years, lasted long enough for you to learn

to do it, and was substantial gainful activity."  20 C.F.R. § 1565(a).  The regulations provide

guidance regarding how much income needs to be earned to constitute "substantial gainful

activity":

> Generally, in evaluating your work activity for substantial gainful activity
> purposes, our primary consideration will be the earnings you derive from the
> work activity. . . . We generally consider work that you are forced to stop or to
> reduce below the substantial gainful activity level after a short time because of
> your impairment to be an unsuccessful work attempt.  Your earnings from an
> unsuccessful work attempt will not show that you are able to do substantial
> gainful activity. . .

20 C.F.R. § 404.1574(a).  The regulations provide a table of earnings needed to be earned to

constitute substantial gainful activity.  *See* 20 C.F.R. § 404.1574(b).

> With respect to step five of the disability determination:
>
> a final determination of "not disabled" may only be entered if supported by
> "expert vocational testimony or other similar evidence to establish that there are
> jobs available in the national economy for a person with the claimant's
> characteristics."  If a [vocational expert] is employed to satisfy this burden, he
> must, of course, be informed of the plaintiff's mental impairments if his opinion is
> to carry evidentiary weight.

*Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990) (quoting *Tucker v. Heckler*, 776 F.2d 793,

795-96 (8th Cir. 1985)).

Plaintiff claims that although the ALJ determined that she could perform her prior work

as a photo lab spotter, this was not "past relevant work" as defined by the regulations.  The court

concludes that the record does not reveal enough information about the photography laboratory

-20-

position to determine if it was "past relevant work" or "substantial gainful activity." The record does not indicate how long Plaintiff held the photo spotter position, nor does it indicate how much money she earned at such position. The Plaintiff testified that the longest time she worked at one position was for six months as a fast food employee. *See* AR, p. 567. Thus, the photo spotter position must have been shorter than six months. The regulations emphasize: "We generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt. Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity. . . ." 20 C.F.R. § 404.1574(a). It is not clear that the photo spotter was anything but an "unsuccessful work attempt" based on the duration of the position and the lack of significant earnings. Thus, the court concludes that the ALJ has not adequately explained how the record of the Plaintiff's photo spotter position meets the definition of "past relevant work" outlined in the regulations. Further, the court concludes that the ALJ's opinion does not adequately explain why she dismissed the VE's clear testimony that the Plaintiff could not perform any of her prior occupations once the ALJ provided him with a hypothetical involving Plaintiff's seizures, migraines, and panic attacks.

The court understands the standard of review requires this court to affirm the Commissioner where there is substantial evidence to support the denial of benefits. However, the court concludes that the ALJ did not adequately explain her decision to ignore three out of six IQ scores when reviewing whether Plaintiff met the requirements of Section 12.05C. Further, the court concludes that the evidence in the record does not clearly demonstrate that the Plaintiff's photography laboratory spotter position constituted "past relevant work" as defined by

the regulations. Therefore, this court will **REMAND** this action to the Commissioner for further

consideration of Plaintiff's cognitive functioning and whether Plaintiff is able to participate in

any "past relevant work" as defined by the regulations. In addition, if the Plaintiff is found not

to meet the requirements of Section 12.05C, but not to be able to participate in "past relevant

work," the ALJ should proceed to Step 5 of the analysis to determine whether there are

significant numbers of jobs in the national economy that Plaintiff can perform.

### IV. Conclusion

The Court concludes that, based on the current record, substantial evidence does not

support the ALJ's overall determination that Plaintiff was not disabled within the meaning of the

Act and was not prevented from performing past relevant work. The magistrate's report and

recommendation concluding otherwise will be **REJECTED**. This matter will be **REMANDED**

to the Commissioner for review and further expansion of the record to determine if Plaintiff

meets the requirements of Section 12.05C based on her cognitive functioning and whether she

can perform "past relevant work" as defined by the regulations.

The Court will **GRANT** Plaintiff's motion for summary judgment to the extent that she

seeks remand for further consideration of the evidence. The Court will **DENY** Commissioner's

motion for summary judgment.

A separate order will enter.


_____*/s/ R. Allan Edgar*_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE